IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BALTIMORE GAS AND ELECTRIC COMPANY, | : | |
| Plaintiff | : | |
| | : | |
| and | : | |
| | : | |
| MARYLAND PUBLIC SERVICE COMMISSION and MARYLAND OFFICE OF PEOPLE'S COUNSEL, | : | |
| Plaintiff-Intervenors | : | |
| | : | |
| v. | : | CIVIL NO. AMD 00-2599 |
| | : | |
| UNITED STATES OF AMERICA and LOUIS CALDERA, SECRETARY OF THE ARMY, | : | |
| Defendants | : | |
| | : | |
| and | : | |
| | : | |
| ENRON FEDERAL SOLUTIONS, INC., | : | |
| Defendant-Intervenor | : | |

...o0o...

FILED _____ ENTERED
_____ LODGED _____ RECEIVED

MAR 1 2 2001

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

## MEMORANDUM

Congress determined, in its considered judgment, that the military services should transfer ownership of their utility systems to private interests. As is not infrequently the case, travel is tortuous over Congress' legislative pathways to the intended destination. This case presents a challenge to a solicitation for bids to privatize the utility distribution systems owned by the United States Army at Fort George G. Meade, Maryland.

I.    INTRODUCTION

Plaintiff, Baltimore Gas and Electric Company ("BG&E"), is a regulatee of

intervenor the Maryland Public Service Commission ("the PSC")(together hereinafter,

"plaintiffs"). Plaintiffs maintain this action pursuant to the Administrative Dispute

Resolution Act of 1996, Pub.L. No. 104-320, § 12, 110 Stat. 3870, 3874-76 (1996), codified

in part at 28 U.S.C. § 1491(b) ("ADRA").[1] They contend that the Department of Defense

acted illegally when it issued the bid solicitation referred to by the parties as RFP No.

DACA31-00-R-0026 ("the Solicitation")[2] because: (1) the Solicitation does not specify that

_____

[1]The ADRA provides as follows in pertinent part:

(b)(1) Both the Unite[d] States Court of Federal Claims and the district courts of
the United States shall have jurisdiction to render judgment on an action by an
interested party objecting to a solicitation by a Federal agency for bids or
proposals for a proposed contract or to a proposed award or the award of a
contract or any alleged violation of statute or regulation in connection with a
procurement or a proposed procurement. Both the United States Court of Federal
Claims and the district courts of the United States shall have jurisdiction to
entertain such an action without regard to whether suit is instituted before or after
the contract is awarded.

(2) To afford relief in such an action, the courts may award any relief that the
court considers proper, including declaratory and injunctive relief except that any
monetary relief shall be limited to bid preparation and proposal costs.

(3) In exercising jurisdiction under this subsection, the courts shall give due
regard to the interests of national defense and national security and the need for
expeditious resolution of the action.

(4) In any action under this subsection, the courts shall review the agency's
decision pursuant to the standards set forth in section 706 of title 5.
28 U.S.C. §1491(b).

[2]The Solicitation covers various utility systems at five installations in the Military District
of Washington. This case concerns only that part of the Solicitation regarding the privatization of
(continued...)

the PSC will have jurisdiction over the successful bidder that becomes the new owner of the

Fort Meade utility distribution system, and (2) the Solicitation does not require that a bidder

hold franchise rights and a utility license issued by the PSC. Plaintiffs seek declaratory and

injunctive relief prohibiting any contract award under the Solicitation that fails to embody

the two above requirements.

The defendants are the United States and the Secretary of the Army (hereinafter

together "the Army") and intervenor Enron Federal Solutions, Inc. ("Enron"), a competitor

of BG&E in the utility industry, but a firm which is not a regulatee or licensee of the PSC.

Defendants contend that the Army has acted reasonably to reconcile the conflicting statutory

and regulatory provisions inherent in the regime created by Congress as a part of its

command to privatize utility systems at military installations.[3] Now pending are cross-

motions for summary judgment.[4] The issues have been fully briefed and counsel have been

heard in oral argument. For the reasons explained below, I shall grant summary judgment

to the defendants and enter an appropriate declaratory judgment allowing the Army to

---

[2](...continued)
natural gas and electricity distribution systems at Fort Meade.

[3]"Utility System" is defined as "any system for the generation and supply of electric
power, natural gas, . . . supply shall include distribution. A utility system includes equipment,
fixtures, structures, and other improvements utilized in connection with the systems described
above, as well as the easements or rights-of-way associated with those systems. . . ." Defense
Reform Initiative Directive No. 49, §II A.1, Administrative Record ("AR") Tab 6 ("DRID No.
49").

[4]BG&E requested that its motion for preliminary injunction be treated as a motion for
summary judgment.

proceed.

II.      PRELIMINARY ISSUES

Initially, I shall consider several threshold questions, some of which I raised *sua sponte* at oral argument, and as to which the parties have filed supplemental memoranda: (1) whether the court has Article III jurisdiction over this dispute, and specifically, whether the parties have standing to challenge the Solicitation and whether the dispute is ripe for decision; (2) whether BG&E's complaint is timely; and (3) whether, as BG&E argues, I should stay this matter until the Army has concluded its negotiations with the interested parties and has awarded a contract pursuant to the Solicitation (on the ground that, if BG&E is awarded the contract to purchase the Fort Meade utility distribution system, its claims, as well as those of the PSC, will be moot).

A.      Article III Jurisdiction

This court's power is limited by the boundaries defined in Article III of the United States Constitution. While Congress can enact laws authorizing district courts to exercise more or less of the broader grant of Article III jurisdiction, it cannot confer power upon this court to act outside of its Article III powers. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 491 (1983)("This Court's cases firmly establish that Congress may not expand the jurisdiction of the federal courts beyond the bounds established by the Constitution."). Thus, while ADRA purports to authorize this court to "render judgment on an action . . . objecting to a solicitation . . . for bids," *see supra* n. 1, I must first address whether the current dispute

-4-

satisfies the requirements of Article III.[5]

### 1.    Standing

Clearly, this is a case arising under "the Laws of the United States," U.S. Const. Art.

III, Sec. 2, that is, ADRA. 28 U.S.C. § 1491(b)(1). Additionally, however, Article III

requires a "case or controversy," having as its "irreducible constitutional minimum" the

requirement of standing.[6] *Bennett v. Spear*, 520 U.S. 154, 162 (1997). The Fourth Circuit

applied Supreme Court standing principles in *Burke v. City of Charleston*, 139 F.3d 401,

---

[5]My concern over jurisdictional issues was not unwarranted. For an excellent synopsis of the history of judicial review of government procurement decisions and the legal context in which ADRA was adopted, see the Federal Circuit's recent opinion in *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324,1331-33 (Fed.Cir. 2001). It is worth noting that the provision which granted jurisdiction to the District Courts of the United States in 1996 under ADRA (in contrast to the longstanding and unquestioned jurisdiction of the United States Court of Federal Claims in such cases) was to sunset as of January 1, 2001, in the absence of further legislative action by Congress. *See* Pub.L. No. 104-320, § 12(b). Under a savings provision, because jurisdiction over this case attached prior to the sunset date, this court's jurisdiction to determine the dispute remains intact, notwithstanding Congressional inaction. *Id.* Of course, because the United States Court of Federal Claims is not an Article III court, subject matter jurisdiction ordinarily would not arise in bid protest cases brought in that court. *Cf. United States v. Kasler Elec. Co., Inc.*, 123 F.3d 341, 342 n.2 (6th Cir. 1997).

[6]The Supreme Court has famously stated:
> Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"--an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical. . . . Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)(citations and internal quotations omitted).

405 (4th Cir. 1998), stating that:

> [S]tanding requires: (1) that the plaintiff personally has suffered actual or
> threatened injury that is concrete and particularized, not conjectural or
> hypothetical; (2) that the injury fairly can be traced to the challenged action;
> and (3) that the injury is likely to be redressed by a favorable decision from
> the court.

Viewing BG&E's allegations in the light most favorable to BG&E, these criteria are

satisfied. As to the first prong of the test for standing, a bidder's right to a legally valid

procurement process constitutes a cognizable injury sufficient to confer standing to seek

"forward looking [declaratory and injunctive] relief," *Adarand Constructors, Inc. v. Pena*,

515 U.S. 200, 210 (1995). A bidder is not required to allege that it has actually lost a

contract award. *See Scheduled Airlines Traffic Offices, Inc. v. United States*, 87 F.3d 1356,

1358-59 (D.C. Cir. 1996); *Winstar Communications, Inc. v. United States*, 41 Fed. Cl. 748,

756 (Fed. Cl. 1998).

BG&E alleges that it will be deprived of a competitive advantage to which it is

lawfully entitled if this court declines to compel the Army "to cancel or amend the

solicitation in accordance with federal statutes, regulations and directives." Complaint ¶¶ 67,

76, 79. The gravamen of BG&E's claim is that the law compels the Army to require "the

contract awardee to possess the requisite service territory and franchise rights under

Maryland law to own, operate and maintain Fort Meade's electric and gas distribution

systems." Complaint ¶ 66. Were such restrictions to be added to the Solicitation, BG&E

would enjoy a competitive advantage because it is the only entity to possess such territory

and franchise rights. Whether another entity would be able to secure such rights in time to

submit a successful bid (or to perform pursuant to a successful bid) is, at best, an open question. Thus, BG&E alleges that the Solicitation denies it a competitive advantage because it fails to comply with federal law. This alleged injury is "actual or imminent, not conjectural or hypothetical." *Adarand*, 515 U.S. at 211. It thus satisfies the first prong of the test for standing.

The second requirement of standing, that "the injury fairly can be traced to the challenged action," *Burke*, 139 F.3d at 405, is clearly satisfied. The challenged action is the Army's wording of the Solicitation (grounded in its construction of the underlying statutory provisions), which BG&E alleges deprives it of a competitive advantage to which it is legally entitled. Thus, the injury, the denial of competitive advantage, is caused directly by the challenged action.

Similarly, the third requirement for standing, "that the injury is likely to be redressed by a favorable decision from the court," *id.*, is satisfied. Were this court to grant BG&E the relief it requests, it would prohibit the Army from proceeding with any potential transaction pursuant to the Solicitation or, perhaps, order the Army to amend the Solicitation to require that any "contract awardee . . . possess the requisite service territory and franchise rights under Maryland law to own, operate and maintain Fort Meade's electric and gas distribution systems." If the Solicitation were modified, BG&E would regain its competitive advantage. Thus, I am satisfied that BG&E has Article III standing to bring this suit.[7]

---

[7] I am also satisfied that BG&E qualifies as an "interested party" for purposes of bringing
(continued...)

The same is not true for plaintiff intervenor Office of People's Counsel. The Office of People's Counsel alleges only that it fears that utility rates for residential consumers will increase, and safety will decrease, if a nonregulated utility wins the privatization contract for the Fort Meade distribution systems. This interest is entirely too speculative to satisfy the injury-in-fact requirement for Article III standing. *See Burke*, 139 F.3d at 406-07. First, it assumes that a nonregulated entity will win the competitive bid (which might not happen). Then, it assumes that that entity will not comply with state law and regulations concerning safety and adequacy of utilities delivery. The Solicitation states explicitly that the contract awardee must comply with all state and local health, safety and environmental laws,

---

[7](...continued)

a pre-award bid protest pursuant to ADRA. The term "interested party" is not defined in the ADRA, but it has been interpreted in two ways by courts hearing ADRA claims. Some courts have relied upon the definition supplied in the Competition in Contracting Act, 31 U.S.C. § 3551(2), applicable to GAO bid protests: "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *See Myers Invest. & Sec. Servs., Inc. v. United States*, 47 Fed. Cl. 605, 612-13 (2000); *Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 230 n.5 (1997). BG&E submitted a bid in response to the Solicitation. As the sole utility possessing franchise rights in the area of Fort Meade, it clearly has the capacity to be a serious contender for the contract. Clearly, then, BG&E qualifies as an interested party under this definition.

Other courts have interpreted the term "interested party" under ADRA to be any party that would have standing to challenge agency action under the Administrative Procedures Act. *E.g., American Fed. of Gov't Employees, Local 2119 v. Cohen*, 171 F.3d 460, 473-75 (7th Cir. 1999); *AFL-CIO v. United States*, 46 Fed. Cl. 586, 595 (2000); *ATA Defense Indus. v. United States*, 38 Fed. Cl. 489, 494 (1997). *But see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed.Cir. 2001)(noting but not deciding issue). The APA authorizes suit by a party "'suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute,' 5 U.S.C. § 702, so long as no statute precludes such relief or the action is not one committed by law to agency discretion, 5 U.S.C. § 702(a)." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). As a party alleging injury by the Army's action in issuing a final Solicitation, BG&E clearly also qualifies to bring suit under this broader standard. Thus, I conclude BG&E is an "interested party" under ADRA.

including utilities laws and regulations. Thus, the Office of People's Counsel's assumption would require that the awardee violate the terms of its contract.

Under the circumstances here, the legitimate concern of the Office of People's Counsel, ensuring the protection of residential customers from unreasonable rate increases, is a harm that is too speculative to constitute injury-in-fact. *Id.* The Fort Meade privatization will not affect the electric grid. The Army will continue to purchase the commodity of electricity through the same contract it has had; only the entity which owns and maintains the delivery infrastructure will change. Thus, no major customer will be removed from the regional grid and no argument has been raised to explain how changing control over the Fort Meade delivery infrastructure could possibly affect neighboring residential rate payers. Accordingly, the "harms" for which the Office of People's Counsel seeks redress in this litigation are not "actual or imminent," they are "conjectural or hypothetical," *Adarand*, 115 U.S. at 209, and thus fail to satisfy the first prong of the standing requirement. Thus, the Office of People's Counsel lacks standing and shall be dismissed from this action.[8]

---

[8]In my view, the issue of whether the PSC has statutory or constitutional standing to contest the Solicitation in this court is a thorny question which I do not decide here. The PSC's standing is highly doubtful. More likely than not, it seems, the PSC is not an "interested party" under even an expansive construction of that term as it is used in ADRA and seemingly, it must otherwise await the conclusion of the Army's negotiations with the potential bidders (and, more importantly, find some other statutory source for its right to sue in federal court) before its "claims" are sufficiently concretized (let alone "cognizable") to afford it standing. As BG&E clearly has standing, however, and as BG&E's interests are wholly congruent with those of the PSC under the circumstances of this case, all of the issues necessary and appropriate to a decision here are properly before me. *But cf. infra* n. 24.

2.    Ripeness

The parties agree that this action is ripe for judicial decision. Although, at oral argument, I expressed doubt about this, I now concur. Because, as discussed above, BG&E's claim presents one involving "immediate injury" so as to satisfy Article III standing requirements, to paraphrase the Supreme Court, "[t]he question of . . . ripeness . . . need not detain [me] long." *Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 81 (1978).

"For a case or controversy to be ripe for judicial review, it must involve 'an administrative decision [that] has been formalized and its effects felt in a concrete way by the challenging parties.'" *Arch Mineral Corp. v. Babbitt*, 104 F.3d 660, 665 (4th Cir. 1997)(*quoting Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208 (4th Cir. 1992). More generally, a lack of ripeness occurs only if the systemic interest in postponing adjudication due to a lack of fitness of the issues for judicial determination, outweighs the hardship on the parties created by the postponement. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). To assess the systemic interest in postponing judicial review of agency action and to determine whether the agency action is fit for judicial decision, courts consider (1) whether the issue is purely legal or sufficiently developed factually to allow for a judicial decision; (2) whether the decision is final; and (3) whether the agency would benefit from deferring review until the agency's policies are crystallized and the question arises in more concrete form. *Id.*

In the present case, as to the first *Gardner* factor, the factual record is thoroughly

developed and there is no material factual dispute. The matter for decision is purely a question of law: whether the Army reasonably interpreted federal and state statutory law (and whether it correctly interpreted certain background issues of constitutional law) in its formulation of the Solicitation. As to the second *Gardner* factor, it is clear that the Solicitation is in final form, and it is this form which BG&E alleges causes injury. Congress specifically intended final solicitations to be reviewable prior to an award of the contract. 28 U.S.C. § 1491(b)(1); *see supra* n. 1 . Finally, as to the third *Gardner* factor, the agency would not benefit by a deferral of judicial review. The Army's position as to what the utility privatization and procurement laws require has fully "crystallized," and it is requesting a prompt judicial decision about the correctness of its position. Indeed, the Army contends that it would be harmed by a postponement of a decision on this issue, because its ability to privatize its utilities systems, as Congress has mandated, is severely hampered by the legal uncertainty occasioned by this litigation. This analysis shows that any systemic interest in postponing adjudication is nonexistent.

Even if one were to conclude that the *Gardner* factors militated in favor of declining to exercise jurisdiction at this time, they clearly do not outweigh the considerable hardship the postponement would impose on the parties. BG&E plausibly claimed in its preliminary injunction papers that it would be irreparably harmed by allowing the Solicitation to go forward in its allegedly illegal form. As explained above, I agree that if BG&E's legal interpretation of the conflicting provisions is correct, the Solicitation deprives BG&E of its legally guaranteed competitive advantage in bidding to assume ownership of the Fort Meade

utility systems. The Army would be harmed by a postponement of adjudication because its negotiations with offerors are hampered by legal uncertainty about the governing law, and because it faces the prospect of prolonged litigation and further delay in privatizing its utilities. Understandably, the Army seeks legal clarification now. Thus, I find this matter is ripe for review.

B.      Timeliness

The Army argues that BG&E's claim is untimely and should be dismissed. The Army argues that BG&E was required to file this suit protesting the Solicitation prior to the closing date for proposals, *viz.*, April 27, 2000. BG&E did not file suit until August 28, 2000, electing first to exhaust all available administrative remedies. I reject the Army's argument for the following reasons.

The Government Accounting Office ("GAO"), the administrative agency charged with hearing bid protests, has adopted specific rules that address the timeliness of a protest. 4 C.F.R. § 21.2(a)(1)(2000). These rules specify that a "[p]rotest based upon alleged improprieties in a solicitation which are apparent prior to . . . receipt of initial proposals shall be filed prior to . . . the time set for receipt of initial proposals." *Id.* Several decisions of the Court of Federal Claims have relied upon this GAO rule for guidance in deciding whether a pre-award protest action was timely. *See Allied Technology Group, Inc. v. United States*, 39 Fed. Cl. 125, 146 (1997), *aff'd,* 173 F.3d 435 (Fed.Cir. 1998)(table); *CC Distributors, Inc. v. United States*, 38 Fed. Cl. 771, 775-76 (1997); *Cubic Defense Sys., Inc. v. United States*, 45 Fed. Cl. 239 (1999), *appeal dismissed*, 230 F.3d 1375 (Fed.Cir. 1999). However,

-12-

the Court of Federal Claims has consistently used the GAO timeliness regulations as advisory only, *e.g., Aerolease Long Beach v. United States*, 31 Fed. Cl. 342, 358 (1994), *aff'd*, 39 F.3d 1198 (Fed.Cir. 1994), and it has declined to follow GAO time limitations when to do so was "unsuitable." *Cubic Defense Sys.*, 45 Fed. Cl. at 252. *See also Test Sys. Assoc., Inc.* B-256813.5, 94-2 CPD ¶153, 1994 U.S. Comp. Gen. LEXIS 838 (Oct. 14, 1994)(in this advisory opinion, the GAO ruled on issues that would be time-barred if raised in a GAO protest, but they were not time-barred in federal court under ADRA).

The rationale for the GAO pre-award bid protest rule is that it would be unfair to allow an offeror to submit a proposal and then, when not selected for award, complain that the provisions of the solicitation were defective. Thus, ADRA complaints have been dismissed as untimely when the plaintiff raised no protest in any forum prior to the closing date for bids. *CC Distributors*, 38 Fed. Cl. at 782; *see also Aerolease*, 31 Fed. Cl. at 358.

In the present case, BG&E has diligently pursued its objections to the Army's solicitations for privatization of Fort Meade's utility systems during the entire procurement process. In May 1999, after issuance of the draft version of the previous privatization solicitation, BG&E formally communicated to the Army its objections to various provisions of the solicitation. Thereafter, between August and December 1999, BG&E restated its position on three separate occasions, in response to the Army's issuance of the final version of the previous solicitation and its amendments. In January 2000, BG&E filed a timely agency-level protest with the Army.

In March 2000, the Army canceled the previous solicitation and issued the current

-13-

Solicitation. The Solicitation did not correct all of the defects identified by BG&E, so in April 2000, after restating its objection to the Army, BG&E filed a timely agency-level protest. In May 2000, after the Army indicated its intent to deny the agency protest, BG&E filed a timely protest with the GAO. On August 2, 2000, the GAO denied the protest and on August 24, 2000, it published a public version of its decision. On August 28, 2000, BG&E filed its complaint in this court. I conclude that it would not be unfair to allow BG&E to pursue this ADRA protest action because it has consistently raised its objections to the Solicitation and it did not wait until after bids were closed.

The Army argues that ADRA should be read to require that a federal court complaint must be filed prior to the closing of bids, even if the plaintiff is simultaneously pursuing agency-level and GAO protests. However, federal regulations specify that the GAO "will dismiss any protest where the matter involved is the subject of litigation before a court of competent jurisdiction . . . ." 4 C.F.R. § 21.11(b)(2000).[9] Clearly, ADRA did not intend simultaneous protests to proceed in two fora. Thus, I find that BG&E's suit is timely.

C.    Request for a Stay Pending the Award of the Contract

BG&E argues that I should stay these proceedings pending the Army's contract award, but I disagree. Although, undoubtedly, a court possesses inherent power to issue a

---

[9]These regulations also specify that a federal court can stay its proceedings on a protest and request the GAO to issue an advisory opinion. 4 C.F.R. § 21.11(b)(2000). That is precisely what the Federal Court of Claims did in the cases cited by the Army. *Id. TEAC America Corp. Inc.*, Comp. Gen B-259831, 95-1 CPD ¶273, 1995 U.S. Comp. Gen. LEXIS 404 (May 3, 1995); *Test Sys. Assoc.*, B-256813.5, 94-2 CPD ¶153, 1994 U.S. Comp. Gen. LEXIS 838 (Oct. 14, 1994).

stay, it must not use this power to circumvent the clear intent of Congress to enable particular proceedings to be litigated. *See Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22-23 (1983). Here, Congress clearly intended to afford judicial review of bid protests "without regard to whether suit is instituted before or after the contract is awarded." 28 U.S.C. § 1491(b)(1).

Even had Congress not expressed a policy of adjudicating bid protests pre-award, BG&E has failed to demonstrate a clear case of hardship or inequity outweighing the potential harm to others, as is required to justify a stay. *See Williford v. Armstrong World Indus.*, 715 F.2d 124, 127 (4th Cir. 1983). The only interest that BG&E alleges, avoiding further unnecessary litigation expenses and achieving judicial economy by avoiding a potentially unnecessary judicial ruling, falls far short of a "clear case of hardship or inequity." *Id.* At this point, briefing on the summary judgment motions is complete, and all that remains is my decision. Thus, the parties will not incur further litigation expenses in this court.

BG&E, after an extended colloquy with the court in oral argument, now asserts that it is willing to bear the risk of losing its competitive advantage in the bidding process and wishes to wait until after a contract award to press its legal claims, but I am not inclined to place great weight on this argument. It flies in the face of BG&E's assertions of irreparable harm in its preliminary injunction papers. In any event, equitable arguments do not favor BG&E. Moreover, its standing to bring this challenge depends in large part upon the fact that the harm it suffers when bidding on the current Solicitation is "actual or imminent."

Once the bidding process is complete and the contract is awarded, BG&E's claim of competitive disadvantage would be moot. This basis for standing would evaporate.

On the other side of the balance, in considering an application for stay, is whether "even a fair possibility [exists] that the stay . . . will work damage," *Landis v. North American Co.,* 299 U.S. 248, 254-55 (1936), to the Army or Enron. As explained above in the discussion of ripeness, the Army faces considerable potential damage from delay in clarifying the law governing the Solicitation. In addition, at worst, if Enron were to be awarded the contract, it could proceed with the work necessary to carry out its terms, only to be enjoined by a court's decision that the Solicitation was illegal, and that BG&E was entitled to a sole source contract for the utility privatization at Fort Meade. Thus, there is more than "even a fair possibility" of harm to the parties opposing the stay. *See id.* Accordingly, BG&E's request for a stay is denied.

III.    STANDARD OF REVIEW

The principal question presented in this case is whether the Solicitation embodies a proper interpretation of two conflicting federal statutes and their implementing regulations, one regarding the procedures for the privatization of utilities on military installations and the other regarding the military's purchase of electricity.[10] The ADRA provides that federal

_____

[10]Also at issue in this case are three questions of federal constitutional law: (1) whether Fort Meade is a federal enclave and, as such, is beyond the reach of PSC's regulatory jurisdiction; (2) whether the federal government has waived its sovereign immunity so as to render Fort Meade subject to PSC's regulatory jurisdiction; and (3) whether PSC's potential regulatory jurisdiction over Fort Meade is preempted by federal law. *See infra* pp. 37-48.

courts reviewing bid protest claims "shall review the agency's [bid] decision pursuant to the standards set forth in [the Administrative Procedure Act ("APA")] Section 706 of title 5." 28 U.S.C. §1491(b)(4). In pertinent part, the APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be-- (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations or short of statutory right . . . ." 5 U.S.C. § 706. Under these standards, agency action warrants deference. *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984).

BG&E urges me to review the Army's actions in issuing the Solicitation *de novo*, arguing that *Chevron* deference does not apply to an agency's interpretation of a statute when the statute unambiguously expresses Congressional intent, *see Edelman v. Lynchburg College*, 228 F.3d 503, 507-09 (4th Cir. 2000), or when an agency has not been entrusted to administer the statute in question and the court possesses as much expertise in interpreting it as the agency itself. *See id.* I reject this approach, however, because where, as here, the statute in question does not unambiguously "address the precise question at issue," *Chevron, USA, Inc.*, 467 U.S. at 843, then *Chevron* directs that "the question for the court is whether the agency's answer is based on a permissible construction of the statute [it is entrusted to administer]." *Id.* "In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844. *See generally Whitman v. American Trucking Asso.*, ___ U.S. ___, Nos. 99-1257 and 99-1426, Slip Op. at 20-21 (February 27, 2001); *Lopez v. Davis*, ___U.S. ___, 121 S.Ct. 714, 722-23

(2001).

At issue in this case is the interplay of a statute which mandates the privatization of utility systems on United States military installations, 10 U.S.C. §2688, on the one hand, and the statutory provision concerning the military's acquisition of electricity, the Department of Defense Appropriations Act of 1988, Pub.L. 100-202 § 8093, 101 Stat.1329 (1987) ("§ 8093"), on the other hand, as informed by agency regulations implementing these statutes. *See* 48 C.F.R. § 41(2000); Defense Reform Initiative Directive No. 49, Administrative Record ("AR") Tab 6 ("DRID No. 49"). As the able attorneys representing the parties in this action have amply demonstrated, two (or more) interpretations of these potentially conflicting statutory provisions are plausible and reasonable, thus, indisputably, genuine ambiguity exists. *See Herman v. Local 305, National Post Office Mail Handlers*, 214 F.3d 475, 479 (4thCir. 2000). Manifestly, these statutes concern the sale and procurement of military property and services, which are matters entrusted to the Army's administration. Thus, the Army's interpretation of these statutes is entitled to *Chevron* deference. Accordingly, "the question for [this] court is whether the agency's answer is based on a permissible construction [and reconciliation] of the statute[s]." *Chevron*, 467 U.S. at 843.[11]

Moreover, it is important to note that while the underlying GAO opinion denying BG&E's bid protest is not controlling authority in this court's review of the Army's

---

[11]Of course, while agency action is entitled to a presumption of regularity, that presumption does not shield it from "a thorough, probing, in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971).

interpretation of the subject statutes, the fact that the GAO validated the Army's position is persuasive authority supporting that position. *See American Maritime Officers Serv. v. STC Submarine Sys., Inc.,* 949 F.2d 121, 126 n.6 (4[th]Cir. 1991)("We do give some limited deference to the interpretations of the Cargo Preference Act by the Navy and the GAO when participating in procurement activity.")(*citing M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1304 (D.C.Cir. 1971)); *accord Rapides Regional Med. Ctr. v. Dep't of Veterans' Affairs,* 974 F.2d 565, 572 n.16 (5[th]Cir. 1992)("When actions of procurement officials have been expressly validated by considered decision of the GAO . . . the court should be extremely reluctant to overturn such decisions.")(quoting *Kinnett Dairies, Inc. v. J. C. Farrow,* 580 F.2d 1260, 1272 (5th Cir. 1978)), *cert. denied,* 508 U.S. 939 (1993); *Seamans,* 455 F.2d at 1298-99, 1304 ("A court's reluctance to interfere with the executive procurement process should be especially strong where, as here, the [GAO] made a determination upholding the procurement officials on the merits").

IV.    THE ADMINISTRATIVE PROCEEDINGS

A detailed account of the administrative proceedings will help put this dispute in its proper legal context. As directed by Congress, the Army issued a solicitation requesting proposals for the privatization of electric and natural gas distribution services at Fort Meade, along with numerous other military base utility privatizations. BG&E communicated back and forth with the Army, getting it to revise the solicitation in some respects, but BG&E was nevertheless not satisfied with the end result. Thereupon, BG&E sought a formal opinion

from the PSC as to whether the PSC would have jurisdiction over a private entity which

purchased the Fort Meade electric distribution system. BG&E, the Army and Enron

submitted their respective positions in writing. On January 7, 2000, the PSC's Office of

General Counsel issued a formal opinion concluding that it would have authority over any

non-federal entity awarded the Army contract to own, operate and maintain the electric

system at Fort Meade. Armed with this opinion, BG&E then protested the solicitation to the

GAO. The Army withdrew the solicitation and issued a revised Solicitation on March 28,

2000, the Solicitation at issue here. The GAO subsequently dismissed the BG&E protest as

moot.

The Solicitation specified that the successful bidder would be required to comply with

state law, including state utilities laws, but it did not specify that the successful bidder would

be subject to the PSC's jurisdiction.[12] BG&E protested the Solicitation to the Army, which

---

[12]The Solicitation specifies in several sections that the bidder must comply with state law,
but it does not specify whether the state utilities commission will have jurisdiction:

> "**Section B.1.1 Purpose** . . . The Contractor shall own, operate, and maintain each
> UDC System in accordance with relevant and appropriate state or district public
> service commission operational and maintenance standards, *even if the state or
> district public service commission has no jurisdiction within the Installation.*"
> (emphasis added).
>
> . . .
>
> "**C.1.1 General** The purpose of this Contract is to transfer ownership of specified
> National Capital Region (NCR) installations (Installation) utility distribution and
> collection systems (UDC Systems)(except natural gas distribution systems) from
> the United States Government to one or more non-government entities; to require
> that the new owner, through its own financing arrangements, promptly brings the
> UDC Systems into compliance with all relevant and appropriate standards that
> apply to non-government-owned utility distribution and collection systems; to

(continued...)

indicated it would deny it by refusing to postpone the proposal due date. BG&E then

protested the Solicitation to the GAO. The GAO issued a written decision on August 24,

2000, denying BG&E's protest. *Matter of Virginia Electric & Power Co.; Baltimore Gas &*

---

[12](...continued)
require that the new owner provide quality operation and maintenance of the UDC
Systems; and to require that the new owner provide uninterrupted, high quality
distribution and collection services of the utilities carried by the UDC Systems."
. . .
"**C.3.1 Own, Replace, Upgrade, Repair, Operate and Maintain** . . . .These
services shall be in accordance with all relevant and appropriate local,
state/district and federal codes as well as industry standards. The Contractor(s)
shall be responsible for compliance when relevant and appropriate local,
state/district and federal codes are changed or new ones are put into effect. . . ."
. . .
"**C.8.1 General Performance Standards** Unless otherwise provided for in this
Contract, the Contractor shall perform its required services in accordance with
relevant and appropriate standard construction, operations, maintenance,
management, safety and other relevant codes and standards, written or otherwise,
that apply to its public utility service customers (if applicable) or general public
customers whose service characteristics, either individually or collectively, are
comparable to the service characteristics for the Installation(s). The Contractor
shall be required to comply with all relevant and appropriate local, state/district
and federal codes, regulations or laws, and changes thereto, as they pertain to the
design, installation, operation, maintenance and repair of the utility
distribution/collection systems. The Contractor shall comply with all relevant and
appropriate ordinances, rates, standards, operating policies or standard operating
procedures, as well as modifications thereto, as they are made and enacted. The
Contractor may elect to maintain the UDC System(s) in accordance with
additional or more stringent standards or specifications than the minimum
described herein. *The Contracting Officer reserves the right to periodically
request an unannounced inspection of facilities to assure compliance with
applicable codes and regulations.*" [emphasis added]
. . .
"**C.8.2.1 Electric Standards** The electric distribution system(s) shall be operated
and maintained in accordance with the National Electric Safety Code (ANSI-
C2)(as applicable), National Electric Code (NEC)(as applicable), Army
Regulation (AR) 420-49, all relevant and appropriate state/district, federal, and
local safety, fire, and environmental laws or codes. All meters shall be
maintained according to the Contractor's standard operating procedures, if
relevant and appropriate."

*Electric Co.,* B-285209; B-285209.2.[13]

The GAO decision summarized BG&E's objections to the Solicitation as follows:

[T]he solicitation was defective for failure to acknowledge that privatization of the UDC systems here is subject to state law and regulation. BG&E specifically asserts that the solicitation is defective because it fails to account for the fact that the states generally have authority under the Federal Power Act of 1935, 16 U.S.C. § 824(b)(1)(1994), and the Natural Gas Act of 1938, 15 U.S.C. § 717(C)(1994), over intrastate transactions in electric energy and natural gas and that this authority is applicable to the privatization of the electric and natural gas UDC systems at Fort Meade in Maryland. BG&E asserts that it is the only entity authorized by Maryland law and the Public Service Commission of Maryland (PSC) to own, operate and maintain electric and natural gas distribution systems in the Fort Meade area. According to BG&E, before any other entity can perform the utility privatization requirements for electric and natural gas distribution services at Fort Meade, that entity must first obtain an electric franchise and right to operate from the Maryland state legislature, as well as revision by the PSC of its order designating BG&E as the sole entity responsible for electric service in the Fort Meade area and obtain a gas franchise from Anne Arundel County, Maryland, and the consent of local authorities and the PSC to exercise the gas franchise.[14]

AR Tab 5 at 4 (GAO Decision, Aug. 24, 2000)("GAO Decision").

The GAO's decision concluded, in a detailed and cogently reasoned opinion, "that the protesters have failed to demonstrate that the [S]olicitation was defective in this regard." It noted first that the

---

[13]The Virginia Electric & Power Company ("VEPCO") protested the Solicitation requirement that offerors propose on all utility systems at an installation and the provision for the award of no more than one, consolidated contract at each installation. GAO Decision at 11. VEPCO's protest was consolidated with the BG&E protest at issue here, but the VEPCO issues are not relevant to the present case.

[14]BG&E's letter of protest to the GAO confirms the GAO correctly summarized its objections. AR Tab 18 at 13-14 (BG&E Protest to GAO).

> [Solicitation] already requires the successful contractor to "comply with all relevant and appropriate local, state/district and federal codes, regulations or laws, and changes thereto, as they pertain to the design, installation, operation, maintenance and repair of the utility distribution/collection systems. The Contractor shall comply with all relevant and appropriate ordinances, rates, standards, operating policies or standard operating procedures, as well as modifications thereto, as they are made and enacted." [Solicitation] § C.8.1.

GAO Decision at 5-6. Second, the GAO noted that "[t]he effect of [BG&E's] argument [that the Solicitation must require state and local approval of the awardees] would be that the contracts for electric and natural gas distribution would be awarded on a sole-source basis to the company holding the local utility franchise . . . ." GAO Decision at 6. The GAO went on to reject BG&E's argument because, "unless a court rules otherwise, an agency is entitled to view 10 U.S.C. § 2688 as preempting any effort to limit competition for providing utility distribution services at the military installations to the entities currently approved by the respective states." *Id.*

The GAO observed that "Section 2688 expressly directs and requires that '[i]f more than one utility or entity . . . notifies the Secretary concerned of an interest in a conveyance . . . *the Secretary shall carry out the conveyance through the use of competitive procedures.*'10 U.S.C. § 2688(b)." *Id.* at 7(emphasis added). The GAO reasoned that when "there [is] a 'collision clear and acute' between the federal law which require[s] competitive bidding among suppliers and the state law which directly limit[s] the extent to which suppliers could compete" the state regulations are preempted. *Id.* at 7 (*citing Paul v. United States*, 371 U.S. 245, 253 (1963); *North Dakota v. United States*, 495 U.S. 423, 440 (1990); *United States v. Virginia*, 139 F.3d 984 (4th Cir. 1998); *Gartrell Constr. Inc. v. Aubry*, 940

F.2d 437 (9th Cir. 1991)). BG&E argued to the GAO that despite the fact that more than one

utility had expressed an interest in the privatization, § 2688 does not forbid the application

of exceptions under the Competition in Contracting Act ("CICA"), 10 U.S.C. § 2305(a)(1)

& (c)(1), which would permit the Army to impose "a requirement for state and local

approval" before the selected contractor can commence performing natural gas and electric

distribution services. GAO Decision at 8. Rejecting BG&E's argument, the GAO concluded

that while agencies "may impose restrictions necessary to meet their needs" pursuant to

CICA, "they may not, unless authorized by statute, impose restrictions not based on their

needs." *Id.* The GAO observed "neither section 2688 nor another federal statute authorizes

the use of noncompetitive procedures or the restriction on competition-- [namely] a

requirement for state and local approval-- which BG&E seeks to impose." *Id.*

The GAO also rejected BG&E's argument that the Department of Defense

Appropriations Act of 1988, Pub. L. 100-202, § 8093, 101 Stat. 1329 (1987), mandates the

selection of BG&E for the conveyance of the Fort Meade electric system or for the

acquisition of electric distribution services. Section 8093 states as follows in pertinent part:

> None of the funds appropriated or made available by this or any other Act with
> respect to any fiscal year may be used by any Department, agency, or
> instrumentality of the United States to purchase electricity in a manner
> inconsistent with State law governing the provision of electric utility service,
> including State utility commission rulings and electric utility franchises or
> service territories established pursuant to State statute, State regulation, or
> State-approved territorial agreements.

*Id.* The GAO found persuasive the Department of Defense General Counsel's opinion, based

on the "plain language" of § 8093, that the section applies only to the purchase of the

commodity *electricity*, and not to *the conveyance of an electricity distribution system or the*

*acquisition of electric distribution services*. GAO Decision at 9. Furthermore, in reliance on

the principle that waivers of sovereign immunity should be narrowly construed, the GAO

reasoned that the § 8093 waiver of sovereign immunity from state utilities regulations must

be "limited to the purchase of the electric commodity (electric power) and does not extend

to acquisition of distribution or transmission services." GAO Decision at 9 (*citing United*

*States Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992)).

The GAO also relied on its view that the legislative history of § 8093 was clear that

"'[t]his provision is intended to protect remaining customers of [electric] utility systems from

the higher rates that inevitably would result if a Federal customer were allowed to leave local

utility systems to obtain retail electric utility service from a nonlocal supplier." *Id.* (*citing* S.

Rep. No. 235, 100th Cong., 1st Sess., at 70 (1987); *see* H.R. Conf. Rep. No. 100-498, at 673

(1987)). The GAO found that "the disposal of the government-owned utility distribution

system, not part of the local utility's service base, and the subsequent acquisition of services

from that system, does not appear to be the harm which Section 8093 seeks to avoid, that is,

[electric] utility abandonment by federal customers." GAO Decision at 9 (*citing West River*

*Elec. Ass'n, Inc. v. Black Hills Power & Light Co.*, 918 F.2d 713, 717, 719 (8th Cir. 1990),

*cert. denied*, 484 U.S. 818 (1987)). Accordingly, the GAO found that there is no conflict

between § 8093, which applies to the purchase of the commodity, electricity, and § 2688,

which requires competition in the conveyance of utility systems and the acquisition of distribution services. In any event, the GAO noted, "to the extent that . . . there is a conflict, the specific mandate in the subsequently enacted Section 2688 must prevail." GAO Decision at 10.

The GAO also rejected BG&E's argument that DRID No. 49 requires the Army to engage in sole source negotiations for the privatization. That directive, the GAO wrote,

> generally states that "[c]ompetitive procedures will be used in conducting the privatization of utility systems," and that "[i]f the installation resides in an area served by a franchised and regulated utility, that franchise holder shall not be considered the presumptive conveyee, nor shall another responsible and responsive utility or entity that expresses interest be excluded from the competition." DRID No. 49 § IV. However, DRID No. 49 also adds that "[s]tate law and regulatory policy should be considered when determining the form of competition for franchised and regulated utilities. Where state law and regulatory policy specifically prohibits competition, a sole-source negotiation may be pursued after evaluating response to the synopses."

*Id.* The GAO found reasonable the Army position "that state and local law and regulation do not apply to the award of a contract for conveyance of an on-base utility distribution system under section 2688." *Id.* Moreover, the GAO reasoned, to the extent that BG&E "maintain[s] that the policy expressed in DRID No. 49 calls for another, noncompetitive approach, in effect a sole source, on account of state and local regulation, the specific statutory mandate in section 2688 for competition must prevail." *Id.*

\*       \*       \*       \*       \*       \*       \*

On August 28, 2000, BG&E filed suit here seeking declaratory and injunctive relief; it also brought a motion for a preliminary injunction. Enron intervened on the defendants'

side and the Public Service Commission and the Maryland Office of People's Counsel intervened on the plaintiff's side. The parties and intervenors agreed to an expedited briefing schedule on summary judgment motions, to be considered concurrently with the motion for preliminary injunction.[15] I conducted a hearing on December 8, 2000, at which I requested additional briefing concerning issues of jurisdiction and ripeness.[16]

V.    ANALYSIS

Turning now to consider the merits of this dispute, I am asked to decide whether the Army's reconciliation of two federal statutes and their implementing regulations "is based on a permissible construction of" those statutes and regulations. *Chevron*, 467 U.S. at 843. Essentially, the potentially conflicting laws concern the Army's sale and acquisition of electricity distribution services and electricity, and can be summarized as follows. In 1998 the Defense Reform Initiative was enacted by Congress requiring the privatization of utility systems on military installations using competitive bidding procedures. 10 U.S.C. § 2688. The statute's implementing regulations and § 8093 require that the Army abide state utilities laws in its acquisition of electricity. DRID No. 49; 48 C.F.R. §§ 41.201(d)&(e). (There is no

---

[15]BG&E has filed a motion to supplement the administrative record. BG&E fails to establish reasons sufficient to overcome the presumption that judicial review of administrative agency action is confined to the administrative record before that agency when it acted. *See Fort Sumter Tours, Inc. v. Babbitt*, 66 F.3d 1324, 1335 (4th Cir. 1995). Accordingly, BG&E's motion is denied.

[16]The Army filed a motion to strike portions of BG&E's "Brief Following Oral Argument" on the grounds that it is redundant and that the court did not request additional briefing on the merits of the case. That motion is denied.

corresponding statutory or regulatory authority regarding natural gas, but plaintiffs claim that because the Solicitation specifies that state utilities law standards will apply to the operation of the gas distribution system, that necessarily implies that the PSC may exercise regulatory jurisdiction over natural gas systems, as well.)

This case, a review of an agency decision (the issuance of the Solicitation by the Army), here on cross motions for summary judgment, concerns the Solicitation issued by the Army to privatize the distribution infrastructures for electricity and natural gas at Fort Meade. Plaintiffs assert that any solicitation must specify that the utility systems, once privatized, will be subject to the PSC's jurisdiction as to both electricity and natural gas. Plaintiffs effectively claim, and the GAO opinion found, GAO Decision at 6, that were plaintiffs to prevail, BG&E would be entitled to a sole source contract with the Army since BG&E is the only franchisee for gas and electric for the territory where Fort Meade is located.[17] BG&E and the PSC seek an order requiring the Army to rescind the current

---

[17]The PSC and BG&E contend in their reply briefs that they do not seek sole source negotiations for BG&E. PSC Reply at 3 ("Contrary to Enron's assertions, the Commission has never even suggested that the federal government should be required to convey the system to the local utility monopoly."); BG&E Reply at 11 (". . . BG&E does *not* demand a sole-source contract from the Army. *See* Complaint at 31 (Prayer for Relief). More importantly, the proper application of Maryland law and PSC authority, in accordance with Section 2688, does not require this result."). The PSC and BG&E argue that the Army can award the bid to a nonfranchised contractor and then the contractor can begin the undeniably cumbersome process of obtaining a franchise. The GAO described that process, as explained by BG&E, in the following manner: "[B]efore any other entity can perform the utility privatization requirements for electric and natural gas distribution services at Fort Meade, that entity must first obtain an electric franchise and right to operate from the Maryland state legislature, as well as revision by the PSC of its order designating BG&E as the sole entity responsible for electric service in the Fort Meade area and obtain a gas franchise from Anne Arundel County, Maryland, and the

(continued...)

Solicitation and directing that any future solicitation must specify that the private entity providing electricity and natural gas distribution services to Fort Meade is subject to the PSC's regulatory jurisdiction.

Defendants argue that the Army has, as a matter of comity, agreed to require the private contractor to be bound by state and local health, safety and environmental laws, including utilities laws and regulations. However, the defendants deny that the PSC will have regulatory jurisdiction over the private entity that obtains the contract or otherwise have authority to enforce those state and local standards. The Army argues that *it* will enforce those standards, and notes that there are extensive provisions in the Solicitation requiring the contractor to enable that enforcement. *E.g.,* AR Tab 7 (Solicitation Section E, Inspection and Acceptance; Solicitation Section H.2, Contract Plans and Reports (including: H.2.2 Performance Compliance Plan, H.2.3 Operation and Maintenance (O&M) Plan, H.2.4 Quality Service Plan)).

Defendants further argue that the Army's interpretation of the relevant privatization and procurement law provisions is reasonable and that, in any event, because Fort Meade is

---

[17](...continued)
consent of local authorities and the PSC to exercise the gas franchise." GAO Decision at 4.

The plaintiffs' disclaimers and arguments seem disingenuous. BG&E demanded in its protest to the GAO that "[i]deally, the Army should cancel the Solicitation and pursue privatization of Fort Meade's electric and natural gas systems with BG&E on a sole-source basis . . . . In the alternative, the Army should amend the RFP to require offerors-- as a condition of eligibility for contract award-- to prove that they possess electric and natural gas service territory and franchise rights for the Fort Meade area under Maryland law. . . . Practically speaking, no entity other than BG&E can be expected to make such a showing in the near future." AR Tab 18 at 26 (BG&E Protest to GAO).

a federal enclave, under principles of sovereign immunity and federal preemption, the electric distribution infrastructure at Fort Meade is not subject to the PSC's regulatory jurisdiction and will not be subject to the PSC's regulatory jurisdiction even when it is privatized. Defendants seek to be allowed to go forward with on-going negotiations pursuant to the Solicitation.

For the reasons explained below, I am persuaded that the Army acted reasonably in reconciling the manifest conflicts inherent in the statutory and regulatory regime underlying the privatization initiative mandated by Congress. Put simply, the federal government has absorbed state law, including utilities law, to supply the regulatory standards necessary and appropriate for the operation and maintenance of the electricity and natural gas distribution systems at Fort Meade; however, it has not agreed to the PSC's exercise of jurisdiction for the enforcement of those standards. Instead, the federal government will continue to enforce those standards even after the systems are transferred to private hands. Accordingly, defendants' summary judgment motion shall be granted and plaintiffs' motion shall be denied.

A.    Statutory Interpretation Issues

I consider first BG&E and the PSC's argument that it was not reasonable for the Army to conclude that the federal statutory scheme at issue does not mandate compliance with state utilities law and regulations, including franchise rights and PSC jurisdiction, in the acquisition of electricity and gas distribution services. I begin with this issue because the

federal government, acting through the Army, could agree to the PSC's exercise of regulatory jurisdiction over Fort Meade, and/or to limit its solicitation of bids to only those entities with state franchise rights. If it did that, then the federal government would have brought state law and jurisdiction upon itself. Were that the case, I would not need to reach the issues concerning the federal enclave status of Fort Meade, sovereign immunity and federal supremacy. After careful consideration of the statutes and regulations at issue, I conclude for the reasons below that the Army reasonably concluded that the federal government did not cede regulatory jurisdiction over Fort Meade to the PSC, nor did it intend to limit Army solicitation of bids for privatization of military utilities to only those entities with state franchise rights.

The Congressional mandate to privatize utilities envisions that the military base will ordinarily continue to obtain its electricity and natural gas from or through the physical plant it formerly owned, but that a private entity would be responsible for operating, maintaining and updating it.[18] Thus, the contract of sale of utility systems could include provisions for supplying or, as in the present case, distributing, electricity and natural gas to the base. Indeed, the Solicitation provides for a 50 year contract, followed by sole source negotiations to develop a "follow-on" contract.

The potentially conflicting federal law can be summarized as follows. Pursuant to 10

---

[18]"The DRI's objective is to get the [Department of Defense] out of the business of owning, managing, and operating utility systems by privatizing them." DRID No. 49.

U.S.C. § 2688, it is clear that the sale of the electricity and natural gas infrastructures must be accomplished through competitive procedures even, to a certain extent, if they conflict with state law and regulations. It is also clear that federal statutory provisions and regulations require that the Army must follow state law and regulations, including utilities regulations and franchise agreements, in its purchase of the commodity electricity. Pub.L. 100-202, § 8093; 48 C.F.R §§ 41.201 (d) & (e). Plaintiffs argue that this necessarily requires the PSC to exercise jurisdiction over Fort Meade's electricity distribution infrastructure, even if state law and the PSC's regulatory jurisdiction effectively give one provider (BG&E) a monopoly.[19] (Apparently, plaintiffs claim that because the Solicitation specifies that state statutes and regulations determine the standards for the operation of the natural gas distribution system, the PSC would also have jurisdiction over Fort Meade's natural gas distribution system once it was privately owned.) The defendants argue that when the federal government requires its bidders to comply with applicable state law, the Army itself will enforce compliance and it does not defer jurisdiction to the PSC over the bidder it selects for the operation of Fort Meade's electricity and natural gas distribution systems.

Conveyance of Fort Meade's electricity and natural gas distribution infrastructures must be done competitively. 10 U.S.C. § 2688.[20] In soliciting and considering bids, the Army

---

[19]*But see supra* n. 17.

[20]I note that 10 U.S.C. § 2688 was amended in October 2000, after this case was instituted. In its original formulation, 10 U.S.C. § 2688(b) provided, "[i]f more than one utility or entity . . . notifies the Secretary concerned of an interest in a conveyance . . . the Secretary shall
(continued...)

must act consistently with state regulatory provisions to the extent necessary to ensure that "all interested regulated and unregulated utilities companies and other interested entities receive an opportunity to acquire and operate the utility system." *Id.* The Conference Committee Report for what became § 2688 specifies that the conveyance is to be done "regardless of franchise rights in the area of the installation concerned." Enron Mot. Summ. J., Att. 1 (*citing* Conf. Rep. 106-945 at 683-84). The Army issued a regulation to implement Section 2688 and govern the privatization of utilities; it specifies that if the utility in question resides in an area served by a franchised utility, that utility "shall not be considered the presumptive conveyee" but that others should be allowed to compete. DRID No. 49.

---

[20](...continued)

carry out the conveyance through the use of competitive procedures." AR Tab 14 at 1. In the October 2000 amendments to § 2688, Congress expressly prohibited the application of state public utility law from serving as a basis for curtailing competitive bidding for any of the Army's privatization contracts. The amendment added language specifying that: (1) the Secretary may now utilize non-competitive procedures only in accordance with the Competition in Contracting Act, 10 U.S.C. § 2304 ¶¶ (c) through (f), and (2) the Secretary must ensure that the procurement is conducted in a manner consistent with state law to the extent necessary to ensure that "all interested regulated and unregulated utility companies and other interested entities receive an opportunity to acquire and operate the utility system to be conveyed."

The Conference Committee Report confirmed that the amendments were intended to ensure that "all interested regulated and unregulated entities have the opportunity to acquire and operate utility systems on military installations regardless of franchise rights in the areas of the installation concerned." Enron Mot. for Summ. J., Att. 1 (Conf. Rep. 106-945, 683-84).

While I am bound to review the Solicitation according to the law in effect at the time the Army finalized it and the GAO reviewed it, *see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1329 n. 2 (Fed.Cir. 2001), I note that the October 2000 amendments to § 2688 merely clarified Congress' intent, but effected no substantive change. I refer to those amendments and their legislative history because they elucidate the law in effect at the relevant time. (Ironically, the House of Representatives adopted an amendment which, had it been adopted by the full Congress, would have *required* that this case be decided in favor of BG&E. *See* Trans. of December 8, 2000, Hearing at 60-62. The amendment was discarded in conference.).

However, the regulation goes on to specify that "where state law and regulatory policy specifically prohibits competition, a sole source negotiation may be pursued . . ." provided that the Military Department "must make an independent legal finding that the franchised or regulated utility is the only entity authorized to own and operate the utility system to be privatized." DRID No. 49 § IV.[21] DRID No. 49 requires that a solicitation to privatize a utility system must specify that the conveyee will "ensure that the system complies with all applicable legal and regulatory requirements" if it is to continue in operation. *Id.* at § IV.C.

The heart of the conflict in this case concerns the provision relating to the Army's purchase of "electricity services." DRID No. 49 provides that "[w]hile 10 U.S.C. [§]2688 governs the privatization of the utility system, the acquisition of utility services, even when a part of the privatization, is governed by 40 U.S.C. [§] 481[22] and FAR Part 41." *Id.* at § II.D. Federal Acquisition Regulation Part 41 ("FAR Part 41") requires the federal government to follow state law and regulations, including utilities regulations and franchises, when purchasing electricity services. 48 C.F.R. §§ 41.201(d)&(e).[23] These

---

[21]This resort to noncompetitive bidding is clearly discretionary.

[22]Section 481 is not relevant to our case. It authorizes, *inter alia*, the Administrator to exchange or transfer excess property, and to prescribe policies and methods of procurement.

[23]48 C.F.R. § 41.201(d)(1) references its authorizing statute, Pub. L. 100-102 § 8093 as providing that "none of the funds appropriated by that Act or any other Act . . . may be used for the purchase of electricity by the Government in any manner that is inconsistent with state law governing the providing of electric utility service, including state utility commission rulings and electric utility franchises or service territories established pursuant to state statute, state regulation, or state-approved territorial agreements."

48 C.F.R. § 41.201(e) states: "Prior to acquiring electric utility services on a competitive
(continued...)

regulations implement the Department of Defense Appropriations Act of 1988, Public Law 100-102 § 8093, which provides that "none of the funds appropriated . . . may be used by [the Government] to purchase electricity in a manner inconsistent with State law governing the provision of electric utility service, including state utility commission rulings and electric utility franchises or service territories established pursuant to state statute, state regulation, or state-approved territorial agreements."

Plaintiffs argue that § 8093 applies both to the government's purchase of the commodity of electricity and to the purchase of electricity distribution services, because the commodity and the distribution services were always bundled at the time Congress enacted § 8093. Accordingly, the theory goes, § 8093 requires the Army to conduct sole source negotiations with BG&E for electric distribution services.

Defendants argue that § 8093, by its express terms, applies only to the purchase of the commodity of "electricity," notwithstanding the implementing regulation's reference to "electric utility services," which, admittedly, could be read to include "distribution services." 48 C.F.R. § 41.201(e); *see supra* n. 3. According to the defendants, § 8093 does not apply to electric distribution services.

_____

[23](...continued)

basis, the contracting officer shall determine with the advice of legal counsel, by a market survey or any other appropriate means, e.g., consultation with the state agency responsible for regulating public utilities, that such competition would not be inconsistent with state law governing the provision of electric utility service, including state utility commission rulings and utility franchises or service territories established pursuant to state statute, state regulation, or state-approved territorial agreements."

Defendants rely on the legislative history of § 8093 to support their view that its reach was limited and its purpose clear. The provision is intended "to protect remaining customers of utility systems from having to pay the higher rates by reason of a loss of an existing customer." *West River Electric Assoc. Inc. v. Black Hills Power & Light Co.,* 719 F. Supp. 1489, 1499 (D.S.D. 1989))(*citing* S. Rep. No. 235, 100th Cong., 1st Sess. 70 (1987)), *aff'd,* 918 F.2d 713, 717 (8thCir. 1990). As the Eighth Circuit has recognized, § 8093 was therefore intended to protect the public from higher rates. *See West River Electric Assoc. Inc.,* 918 F.2d at 717. In the case at bar, the Solicitation does not threaten to inflict higher rates on the public because nothing in the record suggests that Fort Meade will not continue to obtain electricity on the same basis as it has in the past. Changing ownership of the distribution system from the federal government to a private entity will not cause abandonment of an existing supplier.

Enron argues persuasively that Congress' subsequent enactment of 10 U.S.C. § 2688 also undermines plaintiffs' expansive reading of § 8093. Section 2688 requires competition for the privatization of utility distribution systems on military installations. Section 8093, according to plaintiffs, prohibits such competition. When faced with potentially conflicting statutes, settled rules of statutory construction teach that the proper course is to interpret them harmoniously to eliminate any conflict. *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 155 (1976). In other words, Congress' requirement of a competitive bid process, in § 2688 compels a narrow reading of § 8093 and its implementing regulation, FAR Part 41, a reading

consistent with § 2688's mandate for competitive procedures. Otherwise, if the statutes are construed expansively so as to foster a conflict, the subsequently enacted and more specific authorization statute § 2688, clearly supercedes the prior appropriation measure. *See United States v. Mitchell*, 39 F.3d 465, 472 (4th Cir. 1994)(when two laws touching on the same subject have irreconcilable differences, the later-enacted or more specific statute takes precedence), *cert. denied*, 515 U.S. 1142 (1995). Either way, § 8093 cannot be construed to prohibit competitive procurement of electricity distribution services in the Solicitation.

Moreover, to read DRID No. 49 to apply FAR Part 41 to procurement of electric utility distribution services would make DRID No. 49 and Section 2688 contradictory, illogical and unworkable. The plaintiffs' reading of DRID No. 49 would require that all bidders be allowed to compete, whether or not franchised under state law, to provide distribution services, but then, if a nonfranchised bidder were successful, it would have to begin the process of securing a franchise, and it would not be assured of obtaining it. Therefore, the result here could be that the winning bidder would acquire Fort Meade's infrastructure for distributing electricity, but not be able to use it, and Fort Meade would be left without electric power.

As can be seen, therefore, it was reasonable for the Army to read DRID No. 49 and § 2688 to require competition in the conveyance of the electric and natural gas utility systems regardless of state franchise rights, and to continue the requirement of FAR Part 41 that the acquisition of the commodity electricity, but not electricity distribution services, comply with

-37-

state utility law and franchise grants. Accordingly, I am persuaded that, as a matter of statutory interpretation, the Army's construction of these federal statutes and regulations is reasonable and I shall defer to the Army's determination.

B.    Constitutional Issues

Both plaintiffs and defendants have fall-back positions. They have undertaken to tease from the Constitution principles and doctrines that might trump any adverse determination I might make in reliance upon settled rules of statutory construction and/or the level of deference allowed in my review of the underlying administrative determinations. In the interest of a complete record, I shall proceed to consider those questions.[24]

1.    The Enclave Clause

Plaintiffs contend that because Fort Meade is now an "administrative center" and no longer a military training facility, it has ceased to be a federal enclave. They assert further that because the State of Maryland ceded jurisdiction to the federal government for the express purpose of establishing a military training facility, when it ceased to be used for that purpose in 1988, jurisdiction reverted to the state. Plaintiffs argue, therefore, that Fort

---

[24]I am cognizant of the well-rooted principle that federal courts have an obligation to avoid the adjudication of constitutional questions that are unnecessary to the decision. *County Court of Ulster County v. Allen*, 442 U.S. 140, 154 (1979). Here, the constitutional issues are arguably independent questions unnecessary to the resolution of this case, and, as well, the plaintiffs' respective standing to challenge Fort Meade's status under the Enclave Clause is problematic. Nevertheless, the constitutional issues are sufficiently bound up with the issue of the reasonableness *vel non* of the Army's statutory interpretation in deciding the manner in which to issue the Solicitation, by providing important background considerations informing the exercise of discretion, that the parties have understandably presented the constitutional issues fully. Thus, I think it appropriate to resolve them.

Meade is subject to the PSC's regulatory jurisdiction. I agree with defendants, however, that

Maryland did not narrowly restrict the conveyance of land to the federal government for

"military training." The plaintiffs have scant support for their contention that Maryland

restricted its grant of jurisdiction for "military training" only. As explained below, I

conclude that Fort Meade is a federal enclave and that the operation of its electricity and

natural gas distribution infrastructures is not subject to the PSC's jurisdiction.

The Enclave Clause, Article I, Section 8, Clause 17, of the United States Constitution

provides:

> Congress shall have power to exercise exclusive legislative jurisdiction. . .
> over all places purchased by the consent of the Legislature of the State in
> which the same shall be, for the erection of forts, magazines, arsenals, dock-
> yards, and other needful buildings.

Authority to cede Fort Meade to the federal government was enacted in 1906 pursuant to

Chapter 743 of the 1906 Laws of Maryland, AR Tab 16, which provided, in pertinent part:

> 1. Be it enacted by the General Assembly of Maryland, That the consent of the
> State of Maryland is hereby given in accordance with [the Enclave Clause] .
> . . by purchase, condemnation of otherwise of any land in this State required
> for sites for custom houses, courthouses, post offices, arsenals or other public
> buildings whatever, or for any other purposes of the government.
>
> 2. That exclusive jurisdiction in and over any land so acquired by the United
> States shall be and the same is hereby ceded to the United States for all
> purposes except the service upon such sites of all civil and criminal process
> of the courts of this State, but the jurisdiction so ceded shall continue no
> longer than the United States shall own such lands.
>
> 3. The jurisdiction shall not vest until the United States shall have acquired
> the title to said lands by purchase, condemnation otherwise; and so long as the
> said lands shall remain the property of the United States when acquired as
> aforesaid, and no longer, the same shall be and continue exempt and

exonerated from all State, county and municipal taxation, assessment, or other charges which may be levied or imposed under the authority of this State.

Pursuant to that statute, Fort Meade was established in 1917 on 7,470.48 acres that the federal government had acquired from various private parties by condemnation, purchases, and leases with options to purchase. Fort Meade began as a training center for troops fighting in World War I. In 1943, 6,161.19 acres were added to the installation pursuant to a letter from the Secretary of War asserting exclusive jurisdiction for "military and certain other purposes." AR Tab 16. Over the years, substantial parcels of land have been ceded back to the state and a few small parcels have been added. Moreover, the federal government has retroceded its exclusive control over approximately 600 to 700 acres of the installation (*e.g.*, its highways) and now shares concurrent jurisdiction with the state in those areas. According to the Army, more than 4,800 acres at Fort Meade remain under exclusive federal jurisdiction.

Enron points out that until this case, no state agency had challenged the federal government's exclusive jurisdiction at Fort Meade. Indeed, a 1971 opinion of the Maryland Attorney General advised state and local law enforcement officials that they have no authority on Fort Meade, even to address crimes committed by non-military personnel, and that if they enter Fort Meade, they do so as private citizens without police powers or immunities. 56 Op. Md. Att'y Gen. 347, 351 (1971). The United States Attorney prosecutes all offenses committed by civilians at Fort Meade.

Plaintiffs quote *Fort Leavenworth R. Co. v. Lowe*, 114 U.S. 525 (1885), for the

-40-

proposition that military facilities are free from state jurisdiction that would impair their effective use, but when "not used as such instrumentalities, the legislative power of the State over the places acquired will be as full and complete as over any other places within her limits." *Id.* at 539. To be sure, a cession by the state to the federal government "is necessarily temporary, to be exercised only so long as the places continue to be used for the public purposes for which the property was acquired or reserved from sale. When they cease to be thus used, the jurisdiction reverts to the state." *Id.* at 542. However, as the Supreme Court has explained, cession of jurisdiction will not revert to the state merely because some parts of a parcel are no longer used in the manner the state intended. *Humble Pipe Line Co. v. Waggonner*, 376 U.S. 369, 372-73 (1964). Indeed, the Court has stated, "[t]he Clause [is] broadly construed . . . [to include] any legitimate government purpose beyond those itemized . . . ." *Kleppe v. New Mexico*, 426 U.S. 529, 542 n.11 (1976), *citing Collins v. Yosemite Park Co.*, 304 U.S. 518, 528-30 (1938).

Plaintiffs also cite *Water Isle Hotel & Beach Club Ltd. v. Kon Tiki St. Thomas, Inc.*, 795 F.2d 325 (3d Cir. 1986), as an example of the application of analogous principles to require the result they seek here.[25] The United States had condemned the island in 1944 for the purpose of building a fort, which was never built. In 1952, the Army transferred control of the island to the Department of the Interior, which subsequently leased the property to a

---

[25]This is a generous way to explain plaintiffs' reliance on this case since it did not involve the Enclave Clause because it concerned property located in a federal territory not subject to Art. I, § 8, cl. 17.

private entity. The lessee built a beach resort. The owner of the beach resort sought exemption from the Virgin Island's Open Shorelines Act but the Third Circuit reasoned that although the federal government acquired the island for a wartime defense purpose, "when that project was abandoned the governmental interest changed from military to proprietary." *Id.* at 328-29. It held that the Virgin Islands could exercise concurrent jurisdiction so long as its enactments do not contravene federal laws applicable to the Virgin Islands. *Id.*

In *United States v. Johnson*, 994 F.2d 980 (2d Cir. 1993), *cert. denied*, 510 U.S. 959 (1993), the Second Circuit elaborated on the reversion principle, stating that "some evolution [of the federal entity's need] might exceed the conditions of a grant of land so severely as to terminate the cession and cause a reversion of jurisdiction . . . . " *Id.* at 986. The *Johnson* court found, however, that even though the Navy was no longer conducting shipbuilding and repair at the Brooklyn Navy Yard, because the Navy was still using the property in question for naval operations, no reversion had occurred. "The Navy's needs change, and jurisdiction ceded to the United States should not revert to the state merely because the function of ceded property evolves over time." *Id.*

In this case, the "public purpose" for the cession of state jurisdiction was not restricted to "military training." Moreover, while Fort Meade closed its maneuver training areas and firing range in 1988, it continues to operate as an integrated Army base with public and

private facilities serving the military and the federal government.[26] Fort Meade remains a

significant military installation, and its tenants are military, non-appropriated funds

instrumentality supports for military personnel, or federal agencies (mostly defense related,

e.g., the National Security Agency).

Indeed, the Maryland General Assembly acknowledged that Fort Meade remains a

federal enclave in its 1999 cessation of additional exclusive jurisdiction to the federal

government over a 265 acre parcel of land adjoining Fort Meade. Unlike prior cessation

laws, however, this statute specifically reserved the State's right to "enforce and ensure

compliance with all applicable environmental and Public Service Commission laws and

regulations" on that 265 acre parcel. Md. Code Ann., St. Gov't. § 14-102(d)(3)(ii).

Accordingly, I conclude that Fort Meade is a federal enclave.[27]

---

[26]Public schools have existed on Fort Meade since at least 1951. The National Security Agency has been located there for decades, as well as the Department of the Treasury and the Environmental Protection Agency. There are also other tenants which are common on military bases including a bank, the Red Cross, and a post office. *See* 10 U.S.C. §§ 2546, 2602, 2667, 2670, and 39 U.S.C. §§ 406, 411. A Burger King® restaurant on the base is operated by the Army-Air Force Exchange Service, a non-appropriated funds instrumentality.

[27]Plaintiffs also argue that because Fort Meade was not established until 1917, and the PSC was founded in 1910, PSC jurisdiction and state utility law continued to apply, and continue to date, within the Fort Meade federal enclave. Plaintiffs argue that state laws in existence when Fort Meade was established and which are not inconsistent with applicable federal statutes, were assimilated as federal law within the enclave. *See United States v. State Tax Comm'n of Mississippi*, 412 U.S. 363, 369 n.12 (1973)("'The Constitution. . . has long been interpreted so as to permit the continuance until abrogated of those rules existing at the time of the surrender of sovereignty which govern the rights of the occupants of the territory transferred. This assures that no area however small will be left without a developed legal system for private rights.'")(*quoting Stewart & Co. v. Sadrakula*, 309 U.S. 94, 99-100 (1940)).

Plaintiffs cite *Paul v. United States*, 371 U.S. 245, 269-70 (1963), for the proposition
(continued...)

2.      Sovereign Immunity

Defendants argue that even if Fort Meade were not a federal enclave, sovereign

immunity is a bar to the exercise of jurisdiction by the PSC. Federal immunity doctrine

prevents states from ordering the federal government to follow state law. *E.g., McCulloch

v. Maryland*, 4 Wheat. 316, 396 (1819)("If Congress has power to do a particular act, no state

can impede, retard or burden it.  Can there be a stronger ground, to infer a cessation of state

jurisdiction?").  Accordingly, unless the federal government itself enacted laws recognizing

the PSC's jurisdiction over Fort Meade, which, as explained above, it did not, I have no

warrant to compel the federal government to recognize the PSC's jurisdiction or to contract

with a state-created monopoly.

States may not "regulate[] the United States directly or discriminate[] against the

_____

[27](...continued)
that this means that in the absence of overriding or conflicting federal legislation, the assimilated
state laws and regulatory scheme continue in effect today. BG&E misinterprets *Paul.* While
*Paul* rather anomalously held that milk price controls in effect at the time that land was acquired
by the federal government in California would apply to certain milk sales within the new federal
enclave, it did not hold that the State of California had jurisdiction to enforce those controls.
Rather, assimilated law becomes federal law subject to federal jurisdiction. *Id.*; *accord Stewart*,
309 U.S. at 102 (pre-cessation state occupational safety standards for building construction
applied in enclaves because they protected residents, but the administrative apparatus of state
labor law "must necessarily be inappropriate.  Some sections authorize quasi-judicial
proceedings or administrative action and may well have no validity in the federal area . . . . It is
not a question here of the exercise of state administrative authority in federal territory."); *Stokes
v. Adair*, 265 F.2d 662, 664 (4th Cir. 1959)(assimilated state laws lose their character as laws of
the state and become federal laws), *cert. denied*, 361 U.S. 816 (1959). Thus, because the Army
has voluntarily included compliance with state health, safety, environment and utility law within
the Solicitation, I do not need to decide whether those state laws were assimilated when Fort
Meade became an enclave.  It is clear that even if they were assimilated, the state did not retain
jurisdiction to enforce state law within the enclave.

Federal Government." *North Dakota v. United States*, 495 U.S. 423, 435 (1990). The principle distinguishes between indirect regulation of federal affairs, such as neutral taxation or regulation imposed on a supplier that indirectly but nominally raises federal costs, which is permissible, and "direct interference with the Federal Government," which is not. *Id.* (state could require importers of liquor at a military installation to comply with certain labeling and sales reporting requirements imposed on all importers of liquor into the state, even though some indirect increased costs were passed on to the federal government); *but see United States v. New Mexico*, 455 U.S. 720, 735 n.11 (1982)(state laws such as taxes on contractors "are constitutionally invalid if they . . . substantially interfere with [federal] activities.").

The Supreme Court and the Fourth Circuit have repeatedly held that federal immunity doctrine prohibits state law from altering federal criteria for contracting or to exercise a "veto" power over the selection of federal contractors. *E.g., Sperry v. Florida*, 373 U.S. 379, 385 (1963); *Public Util. Comm'n of Cal. v. United States,* 355 U.S. 534, 544 (1958) (immunity doctrine violated by state regulations requiring common carriers to receive state approval before offering free or reduced rate transportation to the United States); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956)(private building contractors employed by the federal government immune from neutral state regulation requiring contractors to obtain a state license because that requirement would give the state "a virtual power of review over the federal determination of 'responsibility'"); *United States v. Virginia*, 139 F.3d 984, 989-90 (4[th]Cir. 1998)(state could not require contractors for FBI's background investigation

program to obtain state licenses for investigators as required by state law).

Thus, even if the Army chooses to apply state standards to determine who is a "responsible" bidder, the state cannot second guess the federal judgment by seeking to enforce its own law requiring a state license, franchise or similar regulatory approval. *See Leslie Miller,* 352 U.S. at 190 (even though federal criteria for responsible bidder and state licensing law criteria were similar, "[s]ubjecting a federal contractor to the Arkansas contractor license requirements would give the State's licensing board a virtual power of review over the federal determination of 'responsibility' and would thus frustrate the expressed federal policy of selecting the lowest possible bidder."); *United States v. Virginia,* 139 F.3d at 989-90 (state could not substitute its competency judgment for the FBI's); *accord Citizens & Landowners Against the Miles City/New Underwood Powerline v. Dep't of Energy,* 683 F.2d 1171, 1179-82 (8th Cir. 1982)(federal statute requiring compliance with state standards for public health and safety, environmental protection and siting of power lines does not entitle the state to require the federal government to obtain a state permit); *Columbia Basin Land Protection Ass'n v. Schlesinger,* 643 F.2d 585, 605 (9th Cir. 1981)("The statute refers to standards, it does not mention procedures."). Consequently, the Army must be left to determine who, among the bidders desiring to purchase the electricity and natural gas distribution systems at Fort Meade, is the most advantageous responsible bidder. The PSC has no authority to review that determination by requiring the successful bidder to secure state franchise rights.

3.    Preemption

Finally, defendants argue, the federal law which mandates competition in procurement, 10 U.S.C. § 2688, preempts state public utility laws that preclude competition. As discussed above, § 2688 expressly mandates that privatization is to be carried out by competitive bidding without regard to utility franchise rights. Specifically, say defendants, state public utility laws which restrict the provision of electricity distribution services to companies holding franchises are preempted because they conflict with both the requirements for competition set forth in § 2688, and the general law requiring competition for all federal contracting. 10 U.S.C.§ 2305(b)(4)(C).[28] I find the defendants' arguments persuasive.

Enron cites numerous regulations elaborating the requirement of competition. *See* Enron Mot. Summ J. pp. 25-26. But as the Eighth Circuit has observed, "[s]uffice it to say that federal procurement law is specifically designed to ensure active competition so that the United States may receive the most advantageous contract." *West River Electric Light Assn., Inc.,* 918 F.2d at 717(quotations omitted). The general rule is the promotion of full and open competition in soliciting offers and awarding government contracts. *Id.*

State law is preempted when it actually conflicts with federal law, is generally

---

[28]Section 2305 provides as follows in pertinent part:
"[T]he head of [a federal] agency shall award a contract with reasonable promptness to the responsible source whose proposal is most advantageous to the United States, considering only cost or price and the other factors included in the solicitation."
10 U.S.C. § 2305(b)(4)(C).

inconsistent with federal law, or poses an obstacle to the full realization of Congressional objectives. *See Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368-69 (1986). Clearly, were the Army to honor BG&E's franchise rights by resorting to sole source negotiations against its desire to do so, the Army would aid in the frustration of the federal mandate for competition. Likewise, if the Army were to allow competitive bidding to proceed, only later to allow the state a veto power over the firm that prevails in that process, by requiring the successful bidder to obtain franchise rights after obtaining the bid, it would potentially mire its procurement proceedings in state regulatory processes and thereby frustrate the federal aim of determining for itself the "most advantageous bidder." 10 U.S.C.§ 2305(b)(4)(C). Accordingly, because state public utility franchise law directly conflicts with federal law governing privatization of electric utilities, it is preempted. *See United States v. Virginia*, 139 F.3d at 987-88.

VI.     CONCLUSION

For the foregoing reasons, I shall grant the defendants' motions for summary judgment, deny the motions of BG&E and the PSC, and declare the Solicitation proper. A separate order follows.

Filed: March 12, 2001

ANDRE M. DAVIS
United States District Judge

-48-